UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| ASSOCIATION OF FLIGHT ATTENDANTS-CWA, AFL-CIO, | ) ) ) |
| Plaintiff, | ) ) |
| v. | )   Case No. 1:11-cv-1221-TWP-MJD ) |
| REPUBLIC AIRLINES INC., as successor to and having done business as MIDWEST AIRLINES, INC., | ) ) ) ) |
| Defendant. | ) |

**ENTRY ON PENDING MOTIONS**

This matter is before the Court on three pending motions: Defendant's Motion to Dismiss, Plaintiff's Motion for Summary Judgment, and Defendant's Cross-Motion for Summary Judgment. The Plaintiff in this matter, the Association of Flight Attendants-CWA, AFL-CIO ("AFA"), is seeking to set aside an arbitration decision of the Midwest Airlines Flight Attendant's System Board of Adjustment ("the Board"), pursuant to 45 U.S.C. § 153 First (q) of the Railway Labor Act ("RLA"). Specifically, the AFA argues the Board exceeded its jurisdiction under the RLA when it awarded no monetary relief to AFA after finding Midwest Airlines, Inc. ("Midwest") had committed a breach of the collective bargaining agreement ("the Agreement") between the flight attendants and Midwest. The Defendant, Republic Airlines, Inc. as successor to and having done business as Midwest Airlines, Inc. ("Republic"), argues there is no basis for setting aside the Board's decision because the AFA lacks standing in this action, and in the alternative, the Board acted within its jurisdiction when it declined to award a monetary remedy to the flight attendants. For the reasons set forth below, Republic's Motion to Dismiss

(Dkt. 25) is **GRANTED**, Republic's Motion for Summary Judgment (Dkt. 13) and AFA's Cross Motion for Summary Judgment (Dkt. 28) are **DENIED AS MOOT**.

## I. BACKGROUND

**A.     The Acquisition of Midwest**

The facts of this case are undisputed.  Midwest Airlines, Inc. was founded over twenty-five years ago as a long-haul carrier with regional services based in Milwaukee, Wisconsin. Midwest leased its aircraft and employed experienced pilots and flight attendants to help operate the company's routes.  The flight attendants for Midwest were represented by the AFA and since October 22, 2002 operated under a collective bargaining agreement between the AFA and Midwest. Dkt. 1-1 at 3.  In 2008, Midwest's business began to suffer due to the economic downturn sweeping the nation.  To combat "its economic woes and return to viability," Midwest implemented a business plan resulting in the retirement of its MD-80 and CRJ aircrafts and a reduction from twenty-five to nine B717 aircrafts. Dkt. 1-1 at 3.  Unfortunately, this plan was unsuccessful.  Thereafter, Midwest sought to enter into a code-share marketing agreement with Republic where Republic could market some of Midwest's flights in exchange for cash from Republic Airways Holdings, Inc. ("RAH"), its parent company.  Despite this plan, the Boeing Company ("Boeing"), which leased aircrafts to Midwest, began to seek out another lessee for its twenty-five B717 aircrafts.  By March 2009, Boeing announced an agreement with the other company to transfer all of its B717 aircrafts being leased by Midwest to the other company before the end of the year.  This move would severely hurt Midwest's operations causing it to seek other ways to maintain its operations throughout the remainder of the year.

On June 23, 2009, RAH announced that it would purchase Midwest and make it a wholly owned subsidiary by merging it with RJET Acquisition Inc., another one of RAH's subsidiaries.

*See* Dkt. 1-1 at 3.  Under RAH's control, RJET Acquisition, Inc. would be renamed Midwest "and assume all of the debts, liabilities, obligations, and duties of the pre-acquisition Midwest." Dkt. 1-1 at 3.  On July 31, 2009, the acquisition of Midwest was finalized, and post-acquisition Midwest continued its flight operations as before.  Unfortunately, on September 9, 2009, post-acquisition Midwest announced that it would begin to wind down all of its flight operations, which would lead to staggered furloughs of its pilots and flight attendants.  By November 3, 2009, Boeing had removed the last nine B717 aircrafts from service, leaving post-acquisition Midwest with no aircrafts to operate under its operating certificate.  As such, the last remaining flight attendants were furloughed as of December 4, 2009.

### B.     Filing of the Grievance Against Midwest

During the wind down period of Midwest, RAH "began to operate some of its aircraft as 'Republic Airlines dba Midwest Airlines' using Republic's aircraft, operating certificate, and flight attendants…." Dkt. 1-1 at 4.  As part of this new initiative, Republic began to actively recruit former Midwest flight attendants to work for its flight operations after they had been furloughed.  Dkt. 1-1 at 4.  Republic's replacement of Midwest's flight attendants with its own led to a grievance being filed against Midwest on August 7, 2009.  The grievance alleged that Midwest violated Sections 1.B., 1.C., and 1.D. of the Agreement "when it sold Midwest Airlines to Republic Airlines on July 31, 2009." Dkt. 1-1 at 4.  Specifically, the grievance alleged that "the operation of Midwest branded flying on Midwest routes, but without Midwest Flight Attendants after RAH's acquisition of Midwest violated the Successorship and Scope Provisions of the Agreement." Dkt. 14 at 6.

> Section 1.D of the Agreement ("the Successorship provision") states:
>
> The provisions of this Agreement shall be binding upon any successor of the Company unless or until changed in accordance with the Railway Labor Act.  If

3

> the Company voluntarily transfers control, operation, or management of substantially all of the assets of its business to another entity for the purpose of enabling such transferee to conduct scheduled flight operations over the Company's routes, the company will require the successor to assume the obligations of the Agreement.

Dkt. 1-1 at 5. Section 1.B. of the Agreement ("the Scope provision") states:

> Except as otherwise provided for in this Agreement, all commercial flights operations (whether revenue, non-revenue, scheduled, non-scheduled or charter) conducted by the Company will be flown by Flight Attendants whose names appear on the Midwest Express Airlines, Inc. System Seniority List.

Dkt. 1-1 at 5. For its relief, the AFA sought back pay from November 3, 2009 as well as front pay for all former Midwest flight attendants on the system seniority list from July 31, 2009 until the integration of the Midwest and Republic flight attendant seniority lists.

### C. The Arbitration

After the parties failed to reach a mutual resolution on their own, the grievance was submitted for arbitration before the Board. The Board, comprised of a three-person arbitration panel in accordance with the RLA, included an AFA member, a Midwest member, and a neutral member. The Board was charged with answering the following three questions:

1. Did the Agreement and Plan of Merger violate Section 1D. of the Agreement?

2. Had the operations of Midwest been conducted in violation of Section 1.B. of the Agreement?

3. If yes to Issues 1. and/or 2., what shall be the remedy?

A hearing was held and post hearing briefs were filed by the parties. On March 15, 2011 the Board issued the following findings in its decision under the Arbitrator's Opinion and Interim Award ("Merit Decision"): (1) "There is no showing that Midwest required Republic Airlines to assume the Agreement as a condition of the transfer of these assets as specified in Section 1.D. of the Agreement"; (2) "There is no evidence that absent RAH's investment and subsequent

purchase of Midwest's distressed assets [Midwest] would not have been liquidated"; and (3) "Had [Midwest] required Republic to be bound by the Agreement, the Midwest branded flying conducted by Republic would have been subject to the scope clause provisions in Section 1.B. requiring such flying to be performed by Midwest flight attendants…." Dkt. 1-1 at 8-9.  In short, the Board concluded that Midwest's actions constituted a breach of the Agreement made between it and the AFA.  Importantly, during the period when the Board was deliberating, the National Mediation Board certified another union, the International Brotherhood of Teamsters ("Teamsters"), as the certified representative for the former Midwest flight attendants.  As a result, the National Mediation Board decertified the AFA.

After issuing the Merit Decision, the Board, at the request of the AFA, remanded the issue of remedy to the parties, but retained jurisdiction in the event the parties could not reach an agreement.  Because the parties were unable to reach an agreement on a remedy, the jurisdiction of the Board was invoked to resolve the dispute.  On August 2, 2011, in its Award on Remedy ("Remedy Decision"), the Board acknowledged that it has the authority to award damages for Midwest breach of a contract, but, the Board awarded no monetary relief to the AFA finding there was not a "sufficient causal relationship between [Midwest's] breach of the Agreement and the furlough of former Midwest Flight Attendants to sustain the award of monetary damages…." Dkt. 1-2 at 3.  On September 9, 2011, the AFA filed this action.  Additional facts are added below as needed.

## II. LEGAL STANDARD

When reviewing a 12(b)(1) and 12(b)(6) motion, the Court takes all well-pleaded allegations in the complaint as true and draws all inferences in favor of the plaintiff. *Bielanski v. County of Kane*, 550 F.3d 632, 633 (7th Cir. 2008) (citations omitted).  However, the allegations

must "give the defendant fair notice of what the…claim is and the grounds upon which it rests" and the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 633 (7th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1965 (2007)). Stated differently, the complaint must include "enough facts to state a claim to relief that is plausible on its face." *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009) (citations omitted). To be facially *plausible*, the complaint must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (citation omitted). Finally, a complaint should be dismissed for failure to state a claim "if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Moranski v. Gen. Motors Corp.*, 433 F.3d 537, 538 (7th Cir. 2005).

### III. DISCUSSION

A review of the RLA procedures relating to labor disputes involving airline carriers is instructive. Labor disputes in the airline industry are governed by the RLA. *See* 45 U.S.C. § 181. In particular, "the RLA governs disputes between airline carriers and their employees, with the stated purpose of avoiding interruptions to commerce that might result from such disputes." *Cont'l Airlines, Inc. v. Int'l Bhd. of Teamsters*, 391 F.3d 613, 616 (5th Cir. 2004); *see* 45 U.S.C. § 153. To facilitate this purpose, the RLA establishes mandatory procedures for the resolution of both major and minor disputes. *See Consol. Rail Corp. v. Ry. Labor Exec. Ass'n*, 491 U.S. 299, 302-03 (1989). A "major dispute" involves the formation of collective bargaining agreements. *Id.* at 302. These disputes customarily arise when it is alleged that a collective bargaining agreement is not in place, or when a party seeks to change the terms of an existing agreement. *Id.* On the other hand, a "minor dispute" arises "out of grievances, or out of the interpretation or

application of agreements concerning rates of pay, rules, or working conditions…." *See id.*; 45 U.S.C. § 184.  As such, a minor dispute arises out of the enforcement of an existing collective bargaining agreement.  *See Consol. Rail*, 491 U.S. at 302.

Pursuant to the RLA, minor disputes are resolved through compulsory and binding arbitration procedure before an adjustment board.  *See Rabe v. United Air Lines, Inc.*, 636 F.3d 866, 872 (7th Cir. 2011).  Adjustment boards or system boards of adjustment are composed of arbitration panels consisting of members selected by the air carriers and labor organizations representing the employees.  *See* 45 U.S.C. § 184.  Here, neither party disputes the fact that the underlying matter constitutes a minor dispute under the RLA subject to review by a system board of adjustment, in this case the Midwest Airlines Flight Attendant System Board of Adjustment.  Multiple motions were filed with the Court; however, Republic in its motion to dismiss raised the issue of lack of standing or in the alternative, failure to state a claim upon which relief can be granted.  The Court will address these two issues first.

    **1.**    **Does AFA have Standing?**

As an initial matter, Republic contends that the AFA lacks standing to seek judicial review of the Board's Remedy Decision.  In particular, it argues that the AFA does not have the statutory right to bring its suit because the AFA is no longer the certified representative of Midwest's flight attendants.[1]  As such, it claims that the Teamsters, as the certified representative, has the right to bring a suit to set aside the Board's decision, not the AFA.  *See* Dkt. 26 at 11. In support of its contention, Republic cites 45 U.S.C. § 152 Ninth, which states in relevant part that "[u]pon receipt of such certification the carrier shall treat with the representative so certified as the representative of the craft or class for the purposes of this

---

[1] The parties do not appear to dispute that the National Mediation Board certified the Teamsters as the representative for the former Midwest flight attendants and decertified the AFA or around April 6, 2010.  *See* Dkt. 26 at 8.

chapter." 45 U.S.C. § 152 Ninth. However, AFA claims that despite its decertification it has standing to seek judicial review of the Board's Remedy Decision pursuant to 45 U.S.C. § 153 First (q).

In ruling on a motion to dismiss for want of standing the Court must accept as true all material allegations of the complaint and must draw all reasonable inferences in favor of the plaintiff. *Retired Chi. Police Ass'n v. City of Chi.*, 76 F.3d 856, 862 (7th Cir. 1996). Furthermore, the plaintiff bears the burden of establishing that it meets the required elements of standing. *Id.* Section 153 First (q) states in relevant part that "if any employee or group of employees, or any carrier is aggrieved by the failure of any division of the Adjustment Board to make an award in a dispute referred to it, or is aggrieved by any of the terms of an award or by the failure of the division to include such award then such employee or group of employees or carrier may file in any United States district court…." 45 U.S.C. § 153 First (q). However, Republic argues that Section 153 "does not govern the procedures of arbitration in the airline industry." Dkt. 43 at 2. In addition, Republic cites a number of cases where courts have ruled that uncertified unions lack standing to maintain certain suits involving the enforcement of collective bargaining agreements on behalf of the employees they seek to represent. *See Cooper v. TWA Airlines, LLC*, 349 F. Supp. 2d 495, 503 (E.D.N.Y. 2004) ("Once IAM [decertified union] lost its representative status, American [Airlines] could have no duty to bargain with IAM, and IAM lost its ability to obtain a judicial order compelling American [Airlines] to bargain."); *Grosschmidt v. Chautauqua Airlines, Inc.*, No. C85-1432-A, 1986 WL 10077, at *1 (N.D. Ohio April 11, 1986) ("[T]his court dismissed the Union on the basis that it could not enforce the statutory rights of employees it was not certified to represent and, therefore, the Union lacked standing to bring this lawsuit.").

On the other hand, the AFA relies on a D.C. Circuit case, *Association of Flight Attendants, AFL-CIO v. Delta Air Lines, Inc.*, 879 F.2d 906 (D.C. Cir. 1989), in arguing that a decertified union has standing to seek damages arising from a pre-decertification breach. In *Delta Air Lines*, AFA represented the Western Airlines' flight attendants as their designated bargaining representative. *Id.* at 907. The AFA's collective bargaining agreement with Western Airlines contained a successorship provision; however, when Western Airlines sought to merge with Delta Airlines it did not seek to contractually bind Delta Airlines to the agreement. *Id.* The AFA filed a grievance against Western Airlines before the merger was complete arguing that Western Airlines had a contractual duty to bind Delta to the collective bargaining agreement pursuant to the successorship provision. *Id.* Western Airlines subsequently denied the grievance, and refused to arbitrate the dispute in front of a system board of adjustment. *Id.* Consequently, the AFA filed a suit in district court seeking to compel arbitration of the AFA's claims; however, during the litigation the NMB retroactively decertified the AFA. *Id.* at 908. The district court dismissed the case for lack of subject matter jurisdiction and the AFA appealed. *Id.* On appeal, the D.C. Circuit held that the district court had jurisdiction to compel arbitration of AFA's claim under the RLA because it only sought damages, rather than specific performance of the provision. *Id.* at 913-14.

After reviewing the relevant cases and applicable statutes relating to a union's ability to seek judicial review of an arbitrator's decision under the RLA's provisions, the Court finds that the AFA has standing to bring this action. The rationale applied by the D.C. Circuit in *Delta Airlines* is persuasive in determining the issue of standing in this case. Similar to the union in *Delta Airlines*, the AFA had been decertified by the NMB following the merger between Republic and Midwest. However, the AFA's decertification did not affect its standing to bring

this suit based on a pre-decertification breach pursuant to 45 U.S.C. § 153, when the union sought only monetary damages rather than specific performance of the Agreement. *See Delta Airlines*, 879 F.2d at 914 ("[T]he NMB's policy of revoking a minority union's certificate as of the date of an operational merger would not be affected if it were later determined that the carrier, by agreeing to the terms of the merger, had breached its CBA. The merger would not be undone; the old CBA would not be reinstated; all employees in any one craft would still be subject to uniform terms of employment…[A]n award of damages would have no effect on NMB's certification determination. The plaintiff union's pre-merger status as representative would not be revived, nor could any factual finding by an arbitrator in a damage action for breach of the CBA either overturn or predetermine the NMB's decision certifying a post-merger representation."). Since the AFA was seeking only back pay and front pay for the alleged breach of the Agreement by Midwest, their subsequent decertification by the NMB does not affect their rights to seek judicial review of the arbitrator's decision.

Additionally, Republic's argument that the AFA does not have the ability to assert a claim pursuant to Section 153 is lacking given other courts' references to Section 153 in cases in which plaintiffs assert challenges to system adjustment boards. *See Coker v. Trans World Airlines, Inc.*, 165 F.3d 579, 583 (7th Cir. 1999) (referencing Section 153 in determining the mandatory arbitral mechanism designed to handle disputes governing collective bargaining agreements in the airline industry); *Chernak v. Sw. Airlines Co.*, 778 F.2d 578, 580 (10th Cir. 1985) (affirming the denial of relief to an individual plaintiff who brought a suit pursuant to 45 U.S.C. § 153 First (q) to set aside an arbitrator's award after alleging it exceed its authority). Moreover, the Fourth Circuit has recognized that courts have looked to Section 153 for guidance in handling airline grievances associated with labor disputes. *See Lekas v. United Airlines*, 282

F.3d 296, 298 n.2 (4th Cir. 2002) (citing *Int'l Ass'n of Machinists, AFL-CIO v. Cent. Airlines, Inc.*, 372 U.S. 682, 685 (1963)) ("However, because the exclusion of § 153 left some gaps in adjudicating airline employee grievances, the Supreme Court has looked in some degree to § 153 for guidance in handling airline grievances."). Based on these line of cases, the Court concludes the AFA has standing to bring this suit under 45 U.S.C. § 153 First (q).

The Court will now turn to Republic's claim that the AFA as failed to show the Board exceeded its jurisdiction when it issued no award on the remedy.

### 2.     Did the Board exceed its jurisdiction?

The scope of judicial review of a system board of adjustment is "among the narrowest known to the law." *Lyons v. Norfolk & Western Ry. Co.*, 163 F.3d 466, 469 (7th Cir. 1999) (quoting *Kulavic v. Chi. & Ill. Midland Ry. Co.*, 1 F.3d 507, 513 (7th Cir. 1993)). However, "a federal court has jurisdiction to review the Board's decision only when it is asserted that (1) the Board failed to comply with the requirements of the Railway Labor Act; (2) the Board failed to confine itself to matters within its own jurisdiction; or (3) the Board or one of its members engaged in fraud or corruption." *Pokuta v. Trans World Airlines, Inc.*, 191 F.3d 834, 839 (7th Cir. 1999).

The AFA does not allege either failure of the Board to comply with the RLA's requirements or fraud or corruption. Instead, it argues that the Board exceeded its jurisdiction by not grounding its Remedy Decision in accepted principles of contract law and by eliminating an employee protection from the Agreement; therefore, its decision must be set aside. Republic counters the AFA's assertions by arguing that the AFA is not entitled to a summary judgment when the Board concluded from its factual determinations that Midwest's flight attendants' harm was not caused by Midwest's breach of the Agreement, but due to "dire economic conditions

11

resulting in the loss of [Midwest's] fleet." Dkt. 1-2 at 3. Thus, the sole question before the Court is whether the Board exceeded its jurisdiction when it did not award a monetary remedy to the former Midwest flight attendants after finding that there was no causal relationship between the Midwest's breach of the Agreement and the flight attendants' furlough. The Court concludes that the answer to this question is no.

The Seventh Circuit has articulated that "an arbitrator's award may be overturned only if the reviewing court is convinced that he was not trying to interpret the collective bargaining contract but that instead he resolved the parties' disputes according to his private notions of justice." *Bhd. of Locomotive Eng'rs v. Atchison, Topeka and Santa Fe Ry. Co.*, 768 F.2d 914, 922 (7th Cir. 1985). Additionally, a reviewing court will enforce the arbitrator's award so long as it "'draws its essence from the contract' even if the court believes that the arbitrator misconstrued its provisions." *United Food and Commercial Workers, Local 1546 v. Ill. Am. Water Co.*, 569 F.3d 750, 754 (7th Cir. 2009) (quoting *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 36 (1987)). "Of course, an award that ignores the plain and unambiguous language of the arbitration contact does not 'draw its essence' from the agreement, and may therefore be overturned under the RLA." *Norfolk and W. Ry. Co. v. Transp. Commc'n Int'l Union*, 17 F.3d 696, 700 (4th Cir. 1994). However, if an arbitrator is even arguably construing or applying the contract, the arbitrator's award must not be disturbed. *See United Paperworkers*, 484 U.S. at 38. As the Supreme Court noted in *United Paperworkers*:

> Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather than by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them.

*Id.* at 37-38.  Finally, once a court concludes that arbitrator did in fact interpret the contract, the court's analysis is at an end.  *See Hill v. Norfolk and W. Ry. Co.*, 814 F.2d 1192, 1195 (7th Cir. 1987).

Here, the AFA argues the Board failed to interpret the Agreement by concluding that even though the former Midwest flight attendants "were injured by a breach of the Agreement, they were not entitled to the protections of the Agreement."  Dkt. 1 at 10.   Simply put, by awarding no monetary remedy, the AFA contends the Board's decision did not draw its essence from the Agreement or accepted principles of contract law and eliminated a right from the Agreement, and thus, the Remedy Decision should be set aside.

The Court does not find that the Board disregarded the language of the Agreement or exceeded its authority in determining that no monetary remedy was justified when it concluded there was no causal relationship between Midwest's breach and the furlough of its former flight attendants.  Although the Board found that Midwest technically had breached the successor provision of the Agreement, the Board did not find that Midwest flight attendants had been harmed by the breach because of Midwest's dire financial state. See Dkt.1-2. The Board concluded that the former Midwest flight attendants would have been furloughed regardless of the RAH acquisition because Midwest was not going to survive as an air carrier. *Id*. The Board cited numerous supporting facts in making its determination, including (1) there was no evidence that Midwest had the funds or credit to replace the recalled Boeing aircraft (2) once the nine remaining B717s were removed by Boeing, Midwest was left without a fleet of aircraft with which to conduct flight operations after November 3, 2009, and (3) Midwest had surrendered its operating certificate and designator code, leaving it with no commercial flight operations to be flown by former Midwest flight attendants.  Based on these factual determinations, the Board

reasonably concluded "[f]rom this evidence, it can be seen the loss of flying and furloughs after November 3, 2009, were products of the dire economic conditions resulting in the loss of [Midwest's] fleet and not the violation of Section 1 [of the Agreement]." Dkt. 1-2 at 3.

As discussed previously, the standard of review of its arbitrator's decision is extremely narrow, and as such, the Court does "not sit to hear claims of factual or legal error by an arbitrator." *United Paperworkers*, 484 U.S. at 37-38; *Robinson v. Union Pacific R.R.*, 245 F.3d 1188, 1193 (10th Cir. 2001) ("[E]ven if we are inclined to disagree with the Board's interpretation of the applicable provisions of the collective bargaining agreement, the applicable standard of review does not permit us to make this interpretation.") (internal quotations and citation omitted)).

Finally, both the AFA and Midwest agreed that the Board would have the authority to determine what the remedy should be if the Board found that Midwest violated the Agreement. The Supreme Court has held:

> When an arbitrator is commissioned to interpret and apply the collective bargaining agreement, he is to bring his informed judgment to bear in order to reach a fair solution for a problem. This is especially true when it comes to formulating remedies. There the need is for flexibility in meeting a wide variety of situations.

*United Steelworkers v. Enterprise Wheel & Car*, 363 U.S. 593, 597 (1960). "[W]here it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect." *United Paperworkers*, 484 U.S. at 38. This Court cannot find that the Board's interpretation of the Agreement were inconsistent with principles of contract law decision not to award a monetary remedy to Midwest's former flight attendants were neither baseless nor without reason. After all, causation is an essential element of liability in a breach of contract claim. See *Shepard v.*

14

*State Automobile Mutual Ins. Co.*, 463 F.3d 742, 745 (7th Cir. 2006). As such, the Board did not exceed the scope of its jurisdiction. Accordingly, the Court lacks subject matter jurisdiction to review the Board's Remedy Decision, accordingly, the AFA's claim must be dismissed.

## IV. CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss (Dkt. 25) is **GRANTED**. Accordingly, Count One of Plaintiff's Complaint is **DISMISSED WITH PREJUDICE**. Furthermore, Plaintiff's Motion for Summary Judgment (Dkt. 13) and Defendant's Cross Motion for Summary Judgment (Dkt. 28) are **DENIED AS MOOT**.

SO ORDERED.  09/17/2012

_____
Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

David J. Carr
ICE MILLER LLP
david.carr@icemiller.com

Robert S. Clayman
GUERRIERI CLAYMAN BARTOS &
PARCELLI, P.C.
rclayman@geclaw.com

Dannie B. Fogleman
FORD & HARRISON LLP
dfogleman@fordharrison.com

N. Skelly Harper
GUERRIERI CLAYMAN BARTOS &
PARCELLI, P.C.
sharper@geclaw.com

Richard J. Swanson
MACEY SWANSON AND ALLMAN
rswanson@maceylaw.com

Paul Conrad Sweeney
ICE MILLER LLP
paul.sweeney@icemiller.com